**350**

In re EAGLE MARINE TRADING
COMPANY, Debtor,

David J. ASKANASE, Trustee, Plaintiff,

v.

SOUTH HAMPTON REFINING
CO., Defendant.

Bankruptcy No. 81–02271–H3–4.
Adv. No. 83–1682–H2.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Dec. 12, 1985.

Marilee Madan, Woodard, Hall & Primm, Houston, Tex., for trustee.

Craig Clendenin, Weller, Whellus & Green, Beaumont, Tex., for South Hampton Refining Co.

## MEMORANDUM OPINION

EDWARD J. RYAN, Bankruptcy Judge.

Eagle Marine Trading Company is a Chapter 7 debtor, formerly engaged in towing and marine transportation services. David Askanase, trustee of the bankruptcy estate, has filed suit against defendant

South Hampton Refining Company to recover various accounts receivable, allegedly arising from services performed in April and May of 1981.

Eagle Marine, as carrier, and South Hampton, as shipper, initially entered into a voyage charter party to transport oil from a terminal in Beaumont, Texas, to Good Hope, Louisiana. This product movement is not now in dispute and the parties have settled appropriate charges.

In a second carriage, however, Eagle Marine agreed to transport oil for South Hampton from Beaumont to a dock in St. Rose, Louisiana. On this voyage, the parties did not draw up a second written charter party, but orally agreed to rely on the same terms specified in the contract for the Good Hope transport as well as previous trading practices.

Two barges, NMS 3106 and 3107, loaded product in Beaumont and proceeded through the Intercoastal Canal to St. Rose. Upon arrival, South Hampton was unable to secure a safe berth to discharge product until thirty-five hours later. Once in position, Barge 3107 was able to discharge its complete cargo in a twenty-one hour period.

Barge 3106, however, could not complete its discharge and went to another dock for steam heating of the oil to facilitate its removal. After a further delay, caused by fog and South Hampton's inability to find dock space for additional discharge, 3106 finally docked a second time at St. Rose. Although discharge commenced, the pump lost suction and 3106, once again, departed the St. Rose dock. During the next eight days, while the pump was under repair, both barges were off charter.

Upon completion of the repair work, barge 3106 went back on charter. For another eleven days, the barge went through more shifting and steaming until South Hampton directed its movement from St. Rose to the LaJet facilities at St. Cecelia, Louisiana. At LaJet, the addition of a different grade oil allowed the repaired pump to gain suction and discharge its remaining cargo in approximately one hour. Barge 3106 then left the St. Cecelia dock, joined the National Marine Service fleet, and went permanently off charter.

The central issue arising from these facts is the responsibility for shifting and steaming costs, tankerman's charges, and demurrage following completion of the repair of the pump on barge 3106. The defendant takes the position that the pump breakdown was the cause of delay. It further argues that the cause of this breakdown was entirely a mechanical defect. The product itself, as developed in the evidence, was at a sufficiently high temperature to permit pump suction. The shipowner, responsible for the seaworthiness of the ship, should, in the defendant's view, assume any subsequent charges.

The primary difficulty with this position is that it completely ignores and even specifically denies the existence of any agreement among the parties. Testimony of the plaintiff's expert witness, however, indicated the parties had entered into a voyage charter party for an earlier product movement from Beaumont, Texas, to Good Hope, Louisiana. The parties orally agreed to incorporate these same terms in the second product movement to St. Rose. The expert and Graham Schooley, president of Eagle Marine in 1981, further verified that this was the custom and practice in the industry and that charter parties were rarely reduced to writing. Taking the defendant's argument in its best light, Eagle Marine has already recognized its responsibility for the proper mechanical functioning of the pump and barge by voluntarily taking the barge off charter while the pump was under repair.

The plaintiff argues on the basis of the voyage charter party and substantial authority that one in position of the defendant is generally liable for all expenses, less lay time, until the release of the vessels. *U.S. v. Atlantic Refining Co.*, 112 F.Supp. 76, 80 (D.N.J.1951); G. Gilmore & C. Black, *The Law of Admiralty*, 211 (2d ed. 1975); 2B Benedict on Admiralty § 31 (7th ed. 1985). In addition, testimony of the plaintiff's expert witness affirmed the custom

and practice of the industry for the charterer to cover incidental expenses, such as tankerman's fees, shifting and steaming charges. The only exception to this would be an equipment breakdown, which would normally reduce demurrage time. *CIA. Estrella Blanca, LTDA. v. S.S. Nictric*, 247 F.Supp. 161, 164 (D.Ore.1965); *S.T. Lake Palourde (ARB)*, 1977 A.M.C. 1692, 1697.

The plaintiff further argues that South Hampton's control of the barge's movements, once the pump was repaired and the barge was back on charter, supports its liability for demurrage. In support of this position, plaintiff cites *Shaver Transportation Co. v. Louis Dreyfus Corp.*, 414 F.Supp. 1040 (D.Ore.1976). There, the court imputed demurrage liability to the ultimate consignee, who had accepted bills of lading with knowledge that the carrier barges remained loaded in the face of adverse prospects for immediate discharge. The plaintiff presents this case to support an imputed demurrage liability to the party in control of and with knowledge of circumstances for unloading, such as South Hampton.

■ While a charterer clearly has numerous responsibilities to avoid the accrual of demurrage, the case law shows that mere control of a vessel does not *ipso facto* run demurrage time. Well-recognized exceptions to the unconditional responsibility of the charterer include specific exonerating clauses in the charter party, a delay being attributable to the fault of the shipowner, or a *vis major. U.S. v. Atlantic Refining*, 112 F.Supp. 76, 80 (N.J.1951); 2B *Benedict on Admiralty* § 38 (7th ed. 1985).

■ In any case, the record did not disclose sufficient evidence of the exact obstacles and vicissitudes encountered by South Hampton in the eleven days prior to docking at LaJet to permit a ruling on the basis of South Hampton's control of the barge's movements.

■ The far better ground for the plaintiff's case is the existence of a charter party incorporating standardized demurrage clauses among parties experienced in their respective businesses and with a record of previous dealings. In admiralty, an oral charter party is enforceable. In the absence of evidence of an express agreement, a charter party is inferrable from the circumstances concerning the actual possession and use of the vessel. *Keller v. U.S.*, 557 F.Supp. 1218, 1227 (New Hampshire, 1983). Under these facts, plaintiff is entitled to demurrage, shifting, steaming and tankerman's charges from the time barge 3106 went back on charter, following repair of the pump to when it rejoined the fleet and went permanently off charter.

■ Plaintiff also requests attorneys' fees, alleging the defendant's refusal to pay charges caused substantial expense to the estate and delay in its administration. While almost exactly two years elapsed from the filing of the complaint until actual trial, the fault does not lie with the parties. The problem is much more with a congested docket and overburdened judicial system which must all too often defer consideration of vital and urgent matters. The record does not indicate the bad faith and dilatory behavior sufficient to justify the sanction of attorneys' fees. See, *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

Plaintiff shall recover damages in the sum of $62,811.24 with interest and costs. Let judgment enter accordingly.